PHENIX *v.* STATE.

Dec. 8, 1952

No. 38549          11 Adv. S. 16          61 So. 2d 392

*Arrington & Arrington,* for appellant.

*Geo. H. Ethridge,* Assistant Attorney General, for appellee.

ROBERDS, P. J.

Robert Phenix, the appellant, and Roy Walker Mabe were jointly indicted for grand larceny in the stealing of $570, the property of Joe Ferguson. Mabe was acquitted; Phenix was found guilty, was sentenced to two years and two days in the state penitentiary, and he appeals.

He urges here four errors he says were committed by the lower court. First, that he was entitled to a directed verdict; second, if not, that the verdict was against the great weight of the evidence; third, that a fatal variance existed between the allegations of the indictment and the proof as to the ownership of the money; and, fourth, that defendant, who had no attorney at the trial, was entitled to have one appointed by the court to defend him.

We will deal with these contentions in the order stated. The first two will be considered together. The principal ground of the first of the two is that the proof fails to show that appellant was the person who stole the money. The testimony as to that will be set out along with the other evidence applicable to the second contention.

Joe Ferguson, the prosecuting witness, testified that in December, 1951, he was a resident of Marion, Ill.; that he had a wife and eight children; that he was the driver of a truck and engaged in buying lumber in several states, including Mississippi, and transporting it to and selling it in other states; that he first met Phenix and Mabe on Saturday, December 15, 1951, in Hazlehurst, Mississippi; that he saw them again at a night club in that city the next night, which was Sunday; that he and Mabe left that club and went to another; in about two hours they

came back to the first club; that the three of them then went to the Hazel Hotel, where all of them were registered and staying, Mabe and Phenix occupying a room adjoining the one occupied by the witness; that Phenix came into the room of the witness; that they had all been drinking; that witness, fully dressed, laid down across his bed and went to sleep. That was about one o'clock; that prior to that time he had gotten a check cashed; had paid out part of the money for a load of lumber, and had remaining upon his person $570 and "some odd dollars"; that this consisted of six or eight fifty dollar bills; four five dollar bills and the balance was in twenty dollar bills. He had this money in his vest pocket and his billfold in his pocket when he went to sleep; that about four o'clock he awakened, and discovered the money had been taken from his vest pocket and his billfold; that he immediately went to the room occupied by Mabe and Phenix and they were gone; that one bed had the appearance that some one had lain thereon but the other showed no indication it had been used; that he immediately called the sheriff and notified him of the theft. He told the sheriff Mabe and Phenix were traveling in a Chevrolet pickup truck, having on its side the words "Termite Pest Control"; that the sheriff immediately called a number of places in an effort to apprehend appellant and Mabe and that shortly thereafter an official of Brookhaven, Mississippi, some 21 miles from Hazlehurst, reported to the sheriff the pickup was at Brookhaven. Appellant and Mabe were arrested Monday afternoon in Montgomery, Alabama. The witness went to Montgomery with the Sheriff of Copiah County and identified the accused and Mabe. He admitted that appellant, upon or after arrest, told the officers that the money they found upon his person had been won by gambling. He also said that Phenix testified at the preliminary hearing he won it gambling with appellant in his room at the Hazel Hotel after they reached the hotel about one o'clock Monday morning.

He says that Phenix gave contradictory testimony as to how he and Mabe came into possession of the money. Witness admitted that he and Mabe gambled at one, or more, of the night clubs to which they went before coming to the hotel; that they used his money for that purpose and won some eight to ten dollars. He said this was the first time he had gambled in five years; that he did not gamble with Phenix at any time or place.

Junior Hall testified that he lived at Brookhaven. He drives a taxicab. He knows Phenix; that he first met Phenix and Mabe at the Royal Cafe in Brookhaven about 2:20 on Monday morning, December 17, 1951. He heard them ask a soldier if they could ride with him in his automobile to Natchez. The soldier said he would have to get some gas. They offered the soldier five dollars with which to buy gas, which the soldier refused. Witness drove to the bus station to meet an incoming bus and while he was there he saw this soldier drive by going towards Natchez. Witness drove back to the Royal Cafe and Phenix and Mabe were standing on the sidewalk apparently waiting for the soldier to return. He told them he had seen the soldier drive away towards Natchez. They asked him if he would drive them to Jackson. He did that. The charge for that was $16. They paid him, getting a twenty dollar bill changed for that purpose. He carried them to the Greyhound Bus Station in Jackson. They told Hall they had driven to Brookhaven in a Chevrolet pickup truck. They had left this parked on the street in front of the Royal Cafe. They asked the witness to move this vehicle from the street. He agreed to, and did, do that, parking it near the Pure Oil Service Station. This he did about 7:30 to 8:00 o'clock Monday morning. He said he had never seen Mabe and appellant before; that they told him they were going towards Mobile or Pascagoula from Jackson. They were drinking.

Julius Harper, Sheriff of Copiah County, Mississippi, testified that Ferguson called him over the telephone at

his home about 4:20 Monday morning, December 17, and reported to him his money had been stolen and that he had reason to believe that Phenix and Mabe had stolen it. He said they had gone from the hotel. He described the Chevrolet truck in which they were riding. The sheriff called the police in a number of cities, reporting the crime, and about twenty minutes thereafter a policeman in Brookhaven reported that the Chevrolet truck was parked on a street in that city and that the suspects were being driven to Jackson to catch a bus. The sheriff called the Greyhound bus station at Jackson and was informed that the parties had been there, and when the agent informed them of the time of departure of the first bus, they told him he did not have anything "quick enough" and they would go to the Tri-State bus station in Jackson. They left the Greyhound station. The sheriff called the Tri-State station and was informed the bus had departed going east. Sheriff called police at Meridian, Birmingham and Montgomery. The police of Montgomery called witness about 4:30 o'clock that afternoon and reported the arrest of Phenix and Mabe. Phenix had upon his person the sum of $221 and a bus ticket from Jackson to Charlotte, North Carolina, for which he had paid $16.96. This money consisted of four fifty dollar bills, one twenty dollar bill and one one dollar bill. Mabe had in his possession $225 and a bus ticket from Jackson to Greensboro, North Carolina, which had also cost $16.96. That consisted of four fifty dollar bills, two five dollar bills and the balance was in one dollar bills. The total in the possession of both men was $446 and the two bus tickets. They were also wearing new shirts, pants and jackets. The sheriff and Ferguson went to Montgomery, where Ferguson identified the parties as those he was with Sunday night and Monday morning and who had been registered in an adjoining room to the one he occupied at the Hazel Hotel. Phenix stepped forward and said "he was the one that won the money gambling." This witness further testified Phenix and

Mabe said they had won the money gambling in Room 4 (Ferguson's room) at the Hazel Hotel. Harper also testified that Ferguson told him he had a wife and eight children; that the money did not belong to him and he could not afford to lose it and if Mabe and Phenix would pay his money back and pay the court costs he would be willing to withdraw his affidavit against them. The sheriff reported to Phenix while Phenix was in jail at Jackson that he thought the matter could be settled for "a little better than $700." It was not settled.

Bryan Mohon, a deputy sheriff of Copiah County, went with the sheriff and Ferguson to Montgomery. He did not remember the amount of money taken from the person of Phenix and Mabe. The part of his testimony having weight on the issues raised is his assertion that he heard the statements of Mabe and Phenix made on the way back from Montgomery and neither ever denied that the money they had on their persons when arrested was the money gotten from Ferguson. The witness was asked "Did the defendant's ever deny this being Ferguson's money? A. No, sir, they never did deny it. Q. Never did deny it? A. No, sir."

Ferguson was here recalled to the stand and gave this testimony: "Q. Mr. Ferguson, you were on the stand just before noon? A. Yes, sir. Q. There was some question raised here about whose money that was. Whose money was it? A. My money. Q. Whose loss was it, if it was missing? A. It was my loss." Here the State rested. Defendants introduced Jeff Vinzant. He testified that he was in the Hazel Hotel on the night of Sunday, December 16, occupying a room near that occupied by Ferguson. He heard some talk about betting by persons in Ferguson's room. ". . . they were talking about betting and they said 'bet $60—$50' and then said cover the whole hundred." He said he did not know who was in the room or who was talking and he was not certain as to the number of the room, although he thought it was No. 5. On cross-examination he admitted he had

registered in and out of the Hazel Hotel a number of times, changing rooms from day to day, but finally made the positive statement he was a guest at that hotel from December 10 to December 22.

Appellant then took the stand. He said he and Mabe first became acquainted with Ferguson on the night of December 16 at Jigg's Place. He said "we was" there rolling high dice for small amounts, but did not say whether that included Ferguson. He and Mabe and Ferguson went from Jigg's Place to another night club. Mabe and Ferguson played poker and shot craps. He and Mabe and Ferguson then went to the Hazel Hotel. The witness and Ferguson engaged in a poker game in Ferguson's room. Mabe went to the room occupied by the witness and Mabe and retired. After the witness and Ferguson finished their game witness went to his room, awakened Mabe and they drove from Hazlehurst to Brookhaven. He said "Everything was closed in Hazlehurst" and they went to Brookhaven to get some whiskey. He admitted meeting Hall, the taxi driver, and engaging him to drive them to Jackson, paying Hall $16 for that service. He said he and Mabe were going home. They were arrested in Montgomery. He denied either of them had purchased any new clothing.

On cross-examination he said he was twenty-five years of age. He admitted he had registered at the Hazel Hotel under the name of Raymond Stone. He said he did that "Because I am an escaped prisoner out of North Carolina for abandonment." Said he had on his person, when he began the rounds, approximately $200, and he did not know how much he won.

That was the testimony for defendant. Mabe did not testify.

In rebuttal the State introduced Mrs. Herman Tillman. She was operating the Hazel Hotel on December 15 and 16, 1951. She testified from the hotel register and said that Vinzant did not stay at that hotel on either of the two named days or nights. She heard no disturbance or

conversation in the room occupied by Ferguson. She identified the registration card upon which Phenix had registered under the name of Raymond Stone. That was all of the testimony.

From this it will be seen that about the only material issue in dispute is whether Phenix came into the possession of the money of Ferguson by gambling or took it without the consent of Ferguson when he was asleep.

The admission of Phenix that the money found upon him in Montgomery was formerly money in the possession of Ferguson, coupled with the similarity of the denominations of the bills, was certainly sufficient to justify the conclusion on the part of the jury that this was the identical money in the possession of Ferguson Monday morning when he and Phenix came to the hotel. Phenix said he won the money from Ferguson. Ferguson said he did not gamble with Phenix. Whether Phenix won the money or took it from the person of Ferguson was a question for the jury. It is understandable that the precipitate flight of Phenix from the scene at so early an hour in the morning, his hurried departure from this State, all in the manner and under the circumstances set out, and the fact that he was an escaped convict, likely weighed heavily against him in the opinion of the jurors.

The trial judge did not commit error in his refusal to grant defendant a peremptory instruction, nor was the verdict of the jury against the great weight of the evidence.

As to the third question, the indictment charged that the stolen money was the property of Joe Ferguson. Appellant says the proof shows it was not his money and that, therefore, there is a fatal variance between the indictment and the evidence.

It was necessary for the State to prove ownership of the money as alleged in the indictment. Robinson v. State, 180 Miss. 774, 178 So. 588; Minneweather v. State, (Miss.) 55 So. 2d 160. However, we think that was

sufficiently done in this case. While at one place in his testimony Ferguson indicated the money was not his personal property but was the property of his employer, he was called back to the stand and stated positively that it was his money. We have quoted above his exact language bearing upon that fact. It was for the jury to determine the fact from the testimony given by Ferguson. However, if it be a fact the money belonged to his employer, it is not intimated that Ferguson was not in the rightful possession of it as an agent of his employer or a bailee of the money. That would be sufficient to meet the objection here urged. Minneweather v. State, supra; 32 Am. Jur., Larceny, Sec. 146.

Lastly, it is contended that appellant was denied due process of law in that the trial judge did not appoint an attorney to defend him, which, it is urged, he was required to do by Art. 3, Section 14 of the Constitution of Mississippi, and by Amendments VI and XIV to the Constitution of the United States. The record reflects these facts as relevant to that question.

Appellant had no counsel to defend him. He did not request the trial judge to appoint one. There was present a Preacher Bryant, presumably a friend, or a sympathizer, who consulted and conferred with the defendant. When the case was called for trial the judge asked Phenix if he had counsel and he replied ''No, sir.'' The judge then inquired ''Preacher Bryant, I understand you are representing the defendants.'' ''By Rev. Bryant: I am going to counsel with them, sir. By the court: I am going to permit it with the understanding you are to receive no fee. You can't do that.'' From this we infer that Preacher Bryant was not an attorney at law.

Phenix was twenty-five years of age. Apparently he was a man of much worldly, and considerable court, experience. He cross-examined the State's witnesses. In this he demonstrated considerable ability as to what was important in his defense. For instance, he pressed Ferguson hard to explain his unusual act of going to

sleep upon his bed fully dressed, with $570 in his pockets and the door to his room unlocked.

The trial judge was unusually solicitous about the rights of appellant. As stated, he permitted Reverend Bryant to counsel with and assist Phenix. At each stage he informed the defendant what his rights were. He explained that defendant could put questions to the prospective jurors and the witnesses. He warned the district attorney to be unusually cautious. When the State rested its case he, of his own initiative, went with the defendant and Mabe and Reverend Bryant and the district attorney into chambers and there informed defendant and Bryant that a motion for a directed verdict for defendants was frequently made at this stage of the trial. Reverend Bryant made that motion, which the court overruled. When appellant took the stand he informed appellant ". . . you may testify to the jury anything you wish to say with reference to your innocence in regard to what occurred on the night of December 16 or morning of the 17, 1951." Phenix then gave his entire statement without interruption. Some of it was subject to objection if objection had been made. The cross-examination of the district attorney consists of a little over two pages of the record. It is stated in the brief of able counsel for appellant in this Court that the trial judge prepared the instructions to the jury for the defendants. There are five of these and they clearly set forth the burdens upon the State, the rights of defendant and what the jurors had to believe and find before they could return a verdict against defendant.

After conviction, the defendant, having then obtained counsel, requested the trial judge to set aside the verdict and grant him a new trial, setting up, among others, the ground that no counsel was appointed to defend him. He made affidavit that he was a stranger in this State; that he had been in jail since his arrest, without opportunity to engage an attorney, or to prepare his defense, and that he had no money with which to employ such

attorney and that he had no friends in Mississippi to assist him. He makes no claim he ever requested the court to furnish him a lawyer. No proof was taken at the hearing in support of this motion. This was the first time these alleged facts had been brought to the attention of the trial judge. The motion was overruled.

Odom v. State, 205 Miss. 592, 37 So. 2d 300, decided November 8, 1948, settled the question that, to that date, neither the constitution, statutes or decisions of this State, nor those of the United States, required or authorized a trial judge in this State to appoint an attorney to defend an accused in non-capital cases under the circumstances of this case. In that case the record was silent as to whether Odom had requested the trial judge to proffer to him the services of counsel. Nor was it shown he was financially unable to employ counsel. His testimony and his examination of the other witnesses, as is true in the case at bar, "clearly indicated his appreciation of what (was) needed to be developed" for his own defense. The only material difference between the Odom case and this case is that Odom was being tried in his home town, whereas Phenix was tried where apparently he was unknown. However, it is not claimed that prejudice existed against him. Indeed, the existence of prejudice is negatived by the acquittal of Mabe, indicted as a participant in the same crime. Good ground for the distinction may be seen in the testimony of Ferguson that Mabe never came into his room at the hotel and in the testimony of Phenix that Mabe, upon their return to the hotel, went to their room.

The opinion in the Odom case, clearly and concisely, analyzed the prior decisions of this Court and the most pertinent decisions of the Supreme Court of the United States, and as stated, concluded that neither the State nor the Federal law required the trial judge to appoint a defender of the accused. That case was appealed to the Supreme Court of the United States, (Odom v. Mississippi, 93 L. Ed. 1092) and on March 28, 1949, that

Court denied certiorari, thereby, in effect, affirming the decision of this Court. That established the law in this State to that date. We find no subsequent decision of this Court changing the rule in the Odom case.

There appear to be four cases decided by the Supreme Court of the United States since the Odom case which bear upon the question under consideration. We will deal with them in the order of time decided.

The decision in Quicksall v. People of Michigan, 339 U. S. 660, 94 L. Ed. 1188, was handed down June 5, 1950. That drama consisted of two acts. The first was the trial of the case on the merits on July 16, 1937, and the second was a proceeding on a motion to set aside the judgment filed April 18, 1947. On the trial on the merits Quicksall pleaded guilty to the murder of Mrs. Grace Parker, his paramour. He had no counsel. He made no request that one be appointed and an appointed counsel was not proffered him. He was 44 years of age and he shot and killed Mrs. Parker and attempted to take his own life in accordance with a prior understanding between them that if their illicit relations should become known they would both "die together". Quicksall had been married and divorced twice and had served two terms in state penitentiaries. He shot Mrs. Parker on July 2, 1937, and was a hospital patient, under police guard, from that date to July 15, when he was brought before the court and waived examination. He entered his plea of guilty the next day. The trial judge had propounded questions to him, and he had made answers thereto, both in open court and at chambers. This examination into the facts was mainly to determine the degree of murder the court should impose upon him under his plea of guilty. The Court found that to be murder in the first degree and sentenced Quicksall to life imprisonment in the state penitentiary, capital punishment having been abolished in Michigan. Quicksall went to the penitentiary.

The second act was begun on April 18, 1947, when Quicksall filed in the court of his conviction a petition to set aside the prior judgment of guilty and grant unto him a new trial. He alleged, as ground for his petition, that he did not have the assistance of counsel at his trial and was prevented from communicating with counsel of his choice while he was in the hospital and that his plea of guilty had been induced by assurances to him by the prosecuting attorney and the sheriff that he was charged with manslaughter, for which his sentence would be from two to fifteen years. The motion to vacate the sentence was heard before the same judge who had received his plea of guilty and sentenced him. Petitioner was asked whether he desired a lawyer in this proceeding and he replied that it had taken him a long time to prepare the petition and he "figured" he was qualified to present it himself. On this hearing he admitted that he knew he had been bound over on a murder charge, and he remembered that before sentence he was asked if he had anything to say and replied that he did not. However, he claimed to be unable to recall details of the former proceedings because of illness. A deputy sheriff, who had guarded him while he was in the hospital after shooting Mrs. Parker, testified the petitioner then said to him, "How long will I have to stay here? I wish to Christ it had taken effect on me like it did on her. If I get over this it will mean life for me anyway". The prosecuting attorney at the first hearing was unavailable as a witness at the second proceeding. The opinion says "The trial judge took no stock in the reconstructing memory of the petitioner and denied his motion". The opinion concluded with this statement: "In the light of what emerged in this proceeding upon a scrutiny of what took place before the same judge ten years earlier, when petitioner's plea of guilty was tendered and accepted, it would stultify the Due Process Clause to find that any right of the petitioner was infringed by the sentence which he incurred". The Court, in another part of the

opinion, used this language: "It is now settled that as to its administration of criminal justice, a State's duty to provide counsel, so far as the United States Constitution imposes it, is but one aspect of the comprehending guaranty of the Due Process Clause of a fair hearing on an accusation, including adequate opportunity to meet it." The Court then indicates that each case must be determined by its own facts.

Gallegos v. State of Nebraska, Law Edition Advance Opinions, Vol. 96—No. 3, pg. 82, was decided November 26, 1951. Gallegos killed his paramour in the State of Nebraska. He was arrested in Texas. He was a thirty-eight-year-old Mexican farmhand, who could neither speak nor write English. While being detained by the officers in Texas, and before any charge or arraignment, he confessed to his crime. A few days after being transported to Nebraska he repeated his confession. Fifteen days later he was carried before a magistrate before whom he pleaded guilty. A short time thereafter counsel was appointed for him. On the trial both the Texas and Nebraska confessions were introduced in evidence against him. He contended the confessions were incompetent, one reason therefor being that he had no counsel when they were made. He was convicted of manslaughter and the conviction was sustained by the Supreme Court of Nebraska and also by the Supreme Court of the United States. The part of the opinion applicable here is this statement: "The Federal Constitution does not command a state to furnish defendants counsel as a matter of course, as is required by the Sixth Amendment in federal prosecutions. Lack of counsel at state non-capital trials denies federal constitutional protection only when the absence results in a denial to accused of the essentials of justice."

Palmer v. Ashe, Warden, Law Edition Advance Opinions, Vol. 96—No. 4, pg. 130, was decided December 11, 1951. This was a habeas corpus proceeding instituted by Palmer against the penitentiary warden while he,

Palmer, was serving a sentence imposed upon a plea of guilty of robbery. The state court denied the petition. The Supreme Court of the United States, by a five to four decision, reversed and remanded the case for further proceedings. The statement of facts in the controlling and minority opinions are not in accord; therefore, we refer for our facts to the summary of the controlling opinion. Petitioner was eighteen years of age. He pleaded guilty to robbery. He had no counsel. His petition alleged he entered his plea on the assurance of officers he was pleading guilty to breaking and entering, a lesser crime than robbery. He had been an inmate of a mental institution for two years, and in reformatories for crimes for eight or ten years. The state court dismissed his petition without giving him an opportunity to offer evidence on the ground that the allegations of the petition, in the light of the trial record, failed to show probable cause for his discharge. The rule of law, announced in the majority opinion, pertinent here is this: "This Court repeatedly has held that the Due Process Clause of the Fourteenth Amendment requires states to afford defendants assistance of counsel in non-capital criminal cases when there are special circumstances showing that without a lawyer a defendant could not have an adequate and a fair defense."

In Stroble v. California, Law Edition Advance Opinions, Vol. 96—No. 12, pg. 529, decided April 7, 1952, Stroble was convicted of murder and sentenced to death. He was represented by counsel at the trial on the merits. After conviction he requested a sanity hearing. He waived a jury hearing on that issue. He was advised to do that by the Public Defender, although prior to that time two deputy public defenders had handled the case in court. It was shown the Public Defender had read the transcript of the record of the trial. The Supreme Court could find no merit in that contention.

Again, while the prosecuting attorney was interrogating the accused after his arrest and before the trial,

on which occasion it is contended he confessed the crime, an attorney appeared and requested to be admitted to the hearing, which request was denied. However, this attorney stated he had come at the request of the son-in-law of the accused, at whose home the crime had been committed, merely to inquire of accused as to his guilt, and report to the son-in-law. Accused claimed it was error not to admit that attorney to the hearing. At no point did he request the aid of counsel while undergoing the interrogation. The Supreme Court found no merit in the contention.

None of these cases required the trial judge to appoint counsel to defend appellant under the facts and circumstances of this case.

In the Odom case, supra, we said: ''Then, too, since we are an intermediate court on the federal constitutional question here involved, we have concluded to affirm the conviction had in the trial court for the reason that in our opinion there is no constitutional provision that would either require or warrant us in doing otherwise. And, also because, ordinarily, if we should reverse and remand such a case there would be no further steps that could be taken by the trial court, since he is without authority to require an attorney to defend free of charge one charged with a non-capital felony, and there is no provision of law for the payment of a fee by the state or county in that behalf. It is not for us to finally say that all prosecutions in non-capital felony cases must be suspended until the legislature provides for a public defender in each case or authorizes the expenditure of public funds for the employment of private counsel. In other words, if the 'underlying control over their local police powers and state court procedures', which the opinion in the Bute case, supra, says was retained by the states from the beginning, is to now be taken from the State contrary to the Tenth Amendment to the Constitution of the United States, we prefer that the responsibility for doing so shall not rest upon us,''

We now reiterate the observations and conclusions as expressed in that quotation.

Affirmed.

*Hall, Lee, Kyle,* and *Ethridge, JJ.,* concur.